GEORGE G. WRIGHT & others *vs.* ROBERT WALCOTT & others.

Middlesex.   January 18, 1921. — May 25, 1921.

Present: RUGG, C. J., BRALEY, CROSBY, PIERCE, & JENNEY, JJ.

*Constitutional Law*, Disposition of property taken by eminent domain and no longer adapted to public uses.   *Eminent Domain.*

While legislation, designed or framed to accomplish the ultimate object of causing property to be taken by eminent domain from private persons avowedly for a public use and then placing it in the hands of one or more private persons for their use, would be unconstitutional, legislation which determines that a part of a tract of land, previously taken under statutory authority for park purposes, is, by reason of the lapse of time or changed conditions, no longer needed for such purposes, and which authorizes the alteration of its use and the maintenance of a public dock or wharf thereon and the lease of the land or any part of it for wharves, terminals and all other commercial purposes for periods not exceeding ninety-nine years, is a valid exercise of the power of the General Court under our Constitution.

St. 1913, c. 393, as amended by Spec. St. 1917, c. 223, and Spec. St. 1919, c. 79, were a warrantable determination by the General Court that the reason for the public use for which land was taken by the city of Cambridge under the authority of Sts. 1892, c. 341; 1893, c. 337, no longer existed so far as a part thereof called " The Front" was concerned, and are constitutional.

The requirement of Spec. St. 1917, c. 223, that the statute should be accepted by vote of the city council of Cambridge before it should become operative, is valid.

The provision of the statutes above described permitting the city council of Cambridge to pass the decisive vote altering the use of " The Front " from public to private purposes is not unconstitutional.

The income received from rentals under the authority of · the statutes above described must be devoted to public uses.

The fact, that the statute above described provided for the leasing rather than for the sale of " The Front," does not make the statute unconstitutional.

BILL IN EQUITY, filed in the Supreme Judicial Court on January 5, 1920, by ten taxable inhabitants of the city of Cambridge, seeking to enjoin the defendants, members of the Industrial Commission of the City of Cambridge appointed by the mayor under St. 1913, c. 393, § 2, from leasing or attempting to lease park land on the Charles River called " The Front."

The suit came on to be heard before *Jenney*, J., upon the pleadings and an agreed statement of facts, which are described in the opinion, and was reserved for determination by the full court.

*F. J. Carney,* for the plaintiffs.

*P. J. Nelligan,* for the defendants.

RUGG, C. J.    This is a bill in equity by ten taxpayers under R. L. c. 25, § 100, now G. L. c. 40, § 53, to restrain conduct of the Industrial Commission of Cambridge alleged to commit that city to obligations unauthorized by law.

The pertinent facts are: The city of Cambridge was authorized by St. 1892, c. 341, and St. 1893, c. 337, to acquire land for public parks.    Under that power and pursuant to a general plan for the development of a parkway and riverside reservation along the Cambridge bank of the Charles River, the city took by eminent domain and purchase about one hundred and thirteen and six tenths acres (exclusive of the land here in question) extending on the river front approximately four miles.    That general plan has been carried out (except as to the land here in question) and stretches from the Cambridge Bridge, on or near the site of an earlier structure called the West Boston Bridge, to the Cambridge Hospital in the westerly part of the city, at an expense of about $2,000,000.    The land in question, called "The Front," contains three hundred and forty-nine thousand eight hundred and twenty-eight square feet of land bounding easterly on the Charles River one thousand seven hundred and fifty-nine feet, northerly on Lechmere Canal, westerly on a street and southerly on land of private owners.    It was taken by eminent domain in 1894 and the owner within a few days thereafter also made conveyance thereof to the city, which became vested with the title in fee.    A sea wall has been built and the land has been filled to grade, each costing slightly in excess of $50,000, the total expense including original cost being nearly $150,000.    The land has not been further worked for park purposes.    It would cost now from $10,000 to $30,000 to adapt it for park uses, depending upon the extent of development.    Since "The Front" was acquired, the Cambridge Bridge has been built at great expense, connecting Boston and Cambridge, having been opened for use in 1909.    It is a substantial structure of fine architectural design.    From this bridge on the Boston side of the Charles River, up stream for a considerable distance, there is an attractive river bank park under the jurisdiction of the Metropolitan Park Commission.    "The Front" and the present parkway system of Cambridge are separated by three lots of land,

occupied by buildings, and utilized as a purely business and commercial district, and communication between the two is by an underpass under Cambridge Bridge and through a business street. . Since 1894 " The Front " has not been in fact devoted to uses of a public park, except that opposite it in the river in each year recently, from about June 30 to the first Monday in September, a floating bath house has been maintained, access to which is by crossing " The Front," and which has been used annually by at least ten thousand people. The neighborhood in its vicinity has been largely given over to business and commercial activities. By St. 1913, c. 393, as amended by Spec. St. 1917, c. 223, and Spec. St. 1919, c. 79, the city of Cambridge has been authorized by vote of its city council " to alter the use " of " The Front," to "maintain a public dock or wharf thereon " and to " lease said land or any part of it for wharves, terminals, and all other commercial purposes for periods not exceeding ninety-nine years." The city council has passed the requisite votes. The defendants as the authorized agents of the city have had tentative proposals concerning leases of the land in question. The plaintiffs contend that the legislative acts just cited authorizing the alteration in the use of the land and its lease for private business and commercial uses are unconstitutional.

It is to be observed that no one having a special or private stake in the matter is objecting. No one complains on the ground of having paid a betterment assessment for the laying out of this land as a park. The proceeding is wholly under the statute by those having a public interest as taxpayers.

There are certain fundamental principles too well settled to be open to question. Moneys raised by taxation and all public funds can be expended only for public purposes. Private property cannot be taken by eminent domain or by contract of purchase except for a public use. It cannot be so taken or purchased from one person or set of persons with the design of handing it over directly or indirectly to another person or set of persons for their private advantage. The taking of private property except for ends which are of a public nature, even though accompanied by full compensation to the owner is contrary to fundamental principles of American jurisprudence and violative of the essential character of a free government. Legislation designed or framed to accomplish the

ultimate object of placing property in the hands of one or more private persons, after it has been taken by the superior power of the government from another private person avowedly for a public use, is unconstitutional. *Salisbury Land & Improvement Co.* v. *Commonwealth,* 215 Mass. 371, and cases there reviewed and collected. *Riverbank Improvement Co.* v. *Chadwick,* 228 Mass. 242. *Opinion of the Justices,* 237 Mass. 597, 608, 609, and cases there collected. *Lynch* v. *Forbes,* 161 Mass. 302, 309. *Wheelock* v. *Lowell,* 196 Mass. 220, 225. *Madisonville Traction Co.* v. *Saint Bernard Mining Co.* 196 U. S. 239, 251. *Hairston* v. *Danville & Western Railway,* 208 U. S. 598, 606.

The taking of land for a public park is for a public use. To that end title may be taken in fee. Land acquired by a city or town by eminent domain or through expenditure of public funds, held strictly for public uses as a park and not subject to the terms of any gift, devise, grant, bequest or other trust or condition, is under the control of the General Court. It may be transferred to some other agency of government or devoted to some other public use by legislative mandate. The power of the General Court in this regard is supreme over that of the city or town. When title in fee is acquired in the land by the municipality for such a public use, there is no right of reversion to the original owner. He has been divested of every vestige of title when he parted with the fee. *Higginson* v. *Treasurer & School House Commissioners of Boston,* 212 Mass. 583. *Stewart* v. *Kansas City,* 239 U. S. 14, 16.

The question never has arisen for express judicial determination in this Commonwealth, whether land once taken in fee for a public use can be sold and devoted to private uses when through the lapse of time or by reason of changed conditions and under legislative authority it has been decided that such land is no longer needed for public uses.

Since 1901 there has been a general law authorizing the abandonment of lands, easements and other rights taken by cities and towns otherwise than by purchase, upon compliance with certain conditions set forth in the statute. G. L. c. 40, § 15. The counsel for the defendants has cited numerous special statutes authorizing cities to sell certain lands acquired or held for park purposes. None of these acts has been attacked in this court.

The question has arisen in other jurisdictions, where it has been

held that, when there is legislative determination or approval to that end, such conveyance may be made when by reason of altered conditions the land is no longer needed for the public use. *Brooklyn Park Commissioners* v. *Armstrong*, 45 N. Y. 234. *Reichling* v. *Covington Lumber Co.* 57 Wash. 225. *Craig* v. *Allegheny*, 53 Penn. St. 477, 481. *Malone* v. *Toledo*, 34 Ohio St. 541. *Matter of City of New York*, 190 N. Y. 350, 358. *McGuire* v. *Atlantic City*, 34 Vroom, 91. *Konrad* v. *Rogers*, 70 Wis. 492. *Lyman* v. *Gedney*, 114 Ill. 388, 403. See *Driscoll* v. *New Haven*, 75 Conn. 92. It was held in *Chase* v. *Sutton Manuf. Co.* 4 Cush. 152, that a mill privilege and flowage rights acquired for the public use of establishing and maintaining a canal, when no longer necessary for the promotion of that enterprise because of its failure, might be sold under legislative authority for private uses. See *Winnisimmet Co.* v. *Grueby*, 209 Mass. 1. It has been held by this court that land acquired by railroads for their public aims may be sold when no longer required. *Williams* v. *Johnson*, 208 Mass. 544. Cities may devote for hire to private uses land or buildings not, for the time being, needed for public purposes. *French* v. *Quincy*, 3 Allen, 9. *Worden* v. *New Bedford*, 131 Mass. 23. *Davis* v. *Rockport*, 213 Mass. 279. It is a familiar incident in public affairs that the easement taken for public travel in laying out a highway may be abandoned by legislative authority and thereby the property reverts unencumbered to the owner of the fee. G. L. c. 82, §§ 1, 21, 30. *Coakley* v. *Boston & Maine Railroad*, 159 Mass. 32. In *Boston* v. *Talbot*, 206 Mass. 82, with reference to takings authorized by St. 1902, c. 534, for the Boston subways and tunnels, it was said at page 90, " The Legislature well might determine that a taking in fee might be necessary in certain cases, in reference to a reasonably economical management of the business, in the public interest, even though the use of the fee would not be needed permanently, and might authorize a subsequent sale or leasing of any rights in the property that were no longer devoted to the public use."

Stating the proposition broadly, the taking in fee of private lands for a public use, the achievement of the aim contemplated, the complete accomplishment of the public purpose designed and the subsequent sale of the land so taken for private improvement is a recognized and valid exercise of the power of the General

Court under our Constitution. *Dingley* v. *Boston,* 100 Mass. 544. *Talbot* v. *Hudson,* 16 Gray, 417. *Bancroft* v. *Cambridge,* 126 Mass. 438. *Moore* v. *Sanford,* 151 Mass. 285. *Sweet* v. *Rechel,* 159 U. S. 380. Most of these cases related to exercise of the police power combined with and supplemented by eminent domain, but they all recognize the existence of power to sell for private improvement land taken by eminent domain for public use when continued ownership by the public agency is no longer necessary.

On principle there is no reason why land taken and used for a municipal building of any sort or other public function may not, when the need is at an end, under legislative authority be sold or otherwise, with due regard to the public interests, be devoted to private purposes.

The facts in the case at bar warrant the inference that time and change have brought into existence new circumstances affecting the wisdom of the use of " The Front " for park purposes. A quite different situation confronts the city now from that facing it in 1894 when the taking was made. The statutes under which the defendants are proceeding to act are equivalent to a determination by the General Court that the reason for the public use no longer prevails. No other rational inference can be drawn from the specific authority to the city to alter uses of the property and to lease it for private business.

Every intendment must be made in favor of the constitutionality of an act of the General Court. *Perkins* v. *Westwood,* 226 Mass. 268. We think it cannot be said that the series of statutes involved in the case at bar are a mere cloak for the transfer of property from one individual to another through the exercise of eminent domain. It reasonably might be decided that the changes in the neighborhood of " The Front," arising from development of other parks, the building of new bridges, the general movement of business and the encroachments of commercial activities in the vicinity, render it more feasible to give up than to continue the use of the land in question to public purposes at the expense to the public treasury now demanded for its development. The relevant facts distinguish the case at bar from *Salisbury Land & Improvement Co.* v. *Commonwealth,* 215 Mass. 371, a case where the statute plainly was adapted for taking land from one private owner under

the guise of eminent domain for the purpose of giving it over in substantial part to other private owners.

The requirement of acceptance of Spec. St. 1917, c. 223, by the city council before it should become operative is a common provision in statutes chiefly affecting a particular municipality. Its validity is not open to doubt. *Graham* v. *Roberts,* 200 Mass. 152, 157. *Barnes* v. *Mayor of Chicopee,* 213 Mass. 1. *Cunningham* v. *Mayor of Cambridge,* 222 Mass. 574, 577.

Although land for a public park is for a general public as distinguished from a proprietary use, there is no fundamental infirmity in permitting the city council to pass the decisive vote altering the use of the land in question from public to private purposes. That comes within the principle illustrated by *Commonwealth* v. *Slocum,* 230 Mass. 180, and the numerous cases there reviewed. Since the expense of the original acquisition of the land and of its filling and the construction of the sea wall was borne by Cambridge, there is manifest public justice in allowing the final word as to the alteration of its use to be pronounced under legislative authority by the official representatives of that city.

The income received from the rental of the land must be devoted solely to public uses. *Duffy* v. *Treasurer & Receiver General,* 234 Mass. 42, 50.

The leasing of the land rather than the sale of it, while unusual in practice, does not appear to involve constitutional objections. None have been presented in argument. If a sale would be valid when authorized, the conveyance of a lesser estate would seem to be within the scope of the same principle.

*Bill dismissed.*