19074

Annie Mary TIMMONS, Appellant, v. THE SOUTH CAROLINA TRICENTENNIAL COMMISSION and Daniel R. McLeod, as Attorney General for the State of South Carolina, Respondents. THE SOUTH CAROLINA TRICENTENNIAL COMMISSION and Daniel R. McLeod, as Attorney General for the State of South Carolina, Respondents, v. Annie Mary TIMMONS and Home Federal and Savings and Loans Association, of whom Annie Mary Timmons is, Appellant.

(175 S. E. (2d) 805)

*Messrs. N. Welch Morrisette, Jr.,* and *William H. Gibbes, of Berry, Lightsey, Gibbes & Bowers,* of Columbia, for *Appellant, in injunction proceeding,*

*Messrs. Augustus T. Graydon, of Graydon & Suber* and *Daniel R. McLeod, Attorney General,* and *Everett N.*

*Brandon, Assistant Attorney General,* of Columbia, *for Respondent, in injunction proceeding,*

*Arthur T. Cole, Esq.,* of Columbia, *for Appellant, in condemnation proceeding,*

*Messrs. Daniel R. McLeod, Atorney General,* and *Everett N. Brandon, Assistant Attorney General* and *Augustus T. Graydon,* of Columbia, *for Respondent, in condemnation proceeding,*

July 7, 1970.

LITTLEJOHN, Justice.

The South Carolina Tricentennial Commission, a State agency created by the General Assembly for the purpose of commemorating the 300th birthday of the State, brought an action against Annie Mary Timmons, a landowner, for the purpose of acquiring through the power of eminent domain a parcel of her real estate for use incident to the tricentennial celebration. In this case she is represented by. Mr Arthur T. Cole. We refer to this action as the condemnation proceeding.

Annie Mary Timmons brought an action against South Carolina Tricentennial Commission and against Daniel R. McLeod, as attorney general, under the Uniform Declaratory Judgment Act, seeking an injunction preventing acquisition of the property. In this case she is represented by Mr. N. Welch Morrisette, Jr. and Messrs. Berry, Lightsey, Gibbes and Bowers. We refer to this action as the injunction proceeding.

The injunction proceeding was tried in equity before Judge Grimball, resident judge of the Fifth Judicial Circuit, and resulted unfavorably to the landowner. Thereafter, the condemnation proceeding was tried before Judge Timmerman and a jury, resulting in a verdict for $325,000.00 in favor of the landowner.

The landowner, through respective counsel, has appealed in each case. Such appeals were argued together before this court and are ripe for our determination. We consider first,

## THE INJUNCTION PROCEEDING

We have carefully studied each of the questions raised by counsel for the appellant as relates to whether an injunction should have been issued. We observe that the same questions were clearly presented to Judge Grimball, and from a study of his order we conclude that he correctly set forth and disposed of all of the issues raised on this appeal. The order of Judge Grimball shall be printed as the opinion of this court, except that paragraph 4 at folio 531 and subsequent paragraphs of the order (relating to matters of no concern on this appeal) will not be included.

## ORDER OF JUDGE GRIMBALL

Annie Mary Timmons is the owner of a lot in the block of land in which the Columbia Exhibit Center is being erected for South Carolina's Tricentennial celebration in 1970. All other properties in the block have been acquired by The South Carolina Tricentennial Commission by purchase. In May of 1969, a joint resolution of the General Assembly gave to The South Carolina Tricentennial Commission the power of eminent domain.

On June 6, 1969, a suit was filed in the clerk's office of this Court seeking to condemn this lot of Miss Timmons. On June 10, 1969, pursuant to a verified complaint presented to the Court on behalf of Miss Timmons, a temporary injunction was granted restraining The South Carolina Tricentennial Commission from proceeding in its

condemnation action. A hearing on the issues raised in the landowner's suit (No. 3650) was set for August 13, but the hearing on the merits in that suit was delayed until August 19 when the landowner sought a continuation of the temporary injunction.

The hearing on August 19 was confined to the issues raised in the landowner's complaint in which she seeks a permanent injunction enjoining any proceedings to condemn her property. Upon a petition from Commission's counsel, this Court modified that temporary injunction to allow the Commission to file certain motions of a pre-trial nature in the condemnation action; those matters are not for consideration at this time.

The Court will, however, comment hereinafter on the Commission's motion for consolidation of the two proceedings without making a final ruling on that motion. That matter, along with other issues not raised in the landowner's proceeding, will be heard at a time set out in this order.

The landowner in her proceeding is testing the validity of the condemnation itself and the enactments under which the condemnation proceedings have been instituted.

The Commission's counsel has stated the points raised by the landowner in that proceeding as follows:

1. There is no necessity for the condemnation;

2. The condemnation does not result in a permanent taking of the property;

3. The taking does not involve a public use of the property as required in eminent domain proceedings;

4. The statutes are discriminatory and deny the landowner due process and the equal protection of the law;

5. The legislative enactments under which the Commission is proceeding are special legislation, prohibited by Article III, Section 34, subsection 9 of the South Carolina Constitution;

6. The legislative enactments do not grant express authority for the condemnation and are defective.

At the hearing, the landowned testified as to her acquisition and development of the property, but none of her testimony related to the issues raised by her pleadings except the statement that the tract had no historical significance. Her counsel relied on the enactments creating The Tricentennial Commission and defining its powers and two letters relating to the enactment of the measure giving the Commission the power of eminent domain.

The Commission's witnesses testified as to the historical and architectural importance of the house and surrounding block, the proposed use of the property as the site for the Columbia exhibit center during The Tricentennial celebration, the projected use of the property after 1970 and the permanent character of the taking. In connection with the latter testimony, the contract between the Commission and HUD and the enactment by the General Assembly of South Carolina in regard to the use of the property were introduced. Other exhibits relating to this property, its acquisition and use were placed in evidence.

I will now consider and rule on the various points raised by the pleadings and at the hearing. The testimony and exhibits relate principally to the necessity for the taking, the permanent nature of the taking and the public use of the condemned property. A letter offering certain testimony relating to the issue of special legislation was received in the Court subsequent to the hearing and will be considered in that part of this Order.

The six issues will be dealt with in the Order set out above.

*(1) The necessity for the Condemnation.*

In the law of eminent domain, it is well established that there must be a necessity for the taking, but this does not mean an absolute necessity, but rather a reasonable necessity. *Seabrook v. Carolina Power & Light Co.*, 159 S. C. 1, 156 S. E. 1. Our Supreme Court said in *White v. Johnson*, 148 S. C. 488, 146 S. E. 411, 412:

"It is well established law that necessity, as well as public use, must always exist in order to warrant the taking of lands, through condemnation, by a grantee of the power of eminent domain. The delegation of the right to exercise that power carries with it the implied condition that it shall be exercised only to the extent found necessary.

"As to what is meant, in this connection, by the term 'necessity', we find the following in 80 C. J., at page 630: 'Necessity * * * does not mean an absolute but only a reasonable necessity, such as would combine the greatest benefit to the public with the least inconvenience and expense to the condemning party and the property owner consistent with each benefit * * *'."

This block will be used as a site for a historical exhibit during 1970 and thereafter as a public park or garden and historic site. The block is the site of the Hampton-Preston house, an antebellum mansion in which the Hampton and Preston families lived prior to and during the Civil War. The house is being restored, and the gardens which were laid out over the entire block are to be replanted after the Tricentennial celebration.

The validity of condemnation for parks, public squares, historical sites or monuments has been established in many instances. The landowner complains that her properties are to be used for parking purposes, but that, too, is a recognized use for which lands can be condemned. Condemnations for ornamental or beautification purposes are recognized as necessary uses in several jurisdictions.

This use is clearly appropriate and fitting for the purposes for which the land is being condemned, and that is the test on the issue of necessity. This determination has been made by the Commission, and, unless the landowner can show that acquisition of this land is not reasonably necessary and is an abuse of discretion, the Court will not interfere.

The record before me establishes that the acquisition ■ of this parcel (as well as all other parcels in this block), is reasonably necessary and in the interest of the public.

This taking is therefore necessary within the meaning of the law of eminent domain, and there is no basis for enjoining the condemnation on this ground.

*2. The Permanent Nature of the Taking.*

Landowner contends that the taking is not permanent because The South Carolina Tricentennial Commission will terminate on January 1, 1972, under the terms of the enactments by which it has been created by the General Assembly.

The Commission has been delegated the power of eminent domain, and the condemnation proceedings have been instituted to acquire the fee simple title to the lot of this landowner. That power was expressly granted to the Commission by the joint resolution of the General Assembly adopted in May of 1969. Joint Resolutiin R. 293, Acts of the General Assembly of 1969.

Prior to that enactment the General Assembly provided that lands acquired with funds of the United States Department of Housing and Urban Development (HUD) under Title VII of the housing act as amended upon the termination of the Commission "shall be turned over to the State or such other governmental entity as the General Assembly may direct, to be preserved and used for park purposes."

Acts of the General Assembly of South Carolina, 1968 No. 1384 Amending Act No. 925 of 1956, as amended. This lot is subject to these provisions since HUD funds will be used in the acquisition.

The title being acquired in a condemnation proceeding is determined by the pleadings; the Petition and Declaration of Taking in this case contemplate a fee simple title being acquired from the landowner.

The subsequent abandonment of the original purpose for which the lands were taken would not affect the validity of the condemnation. "The validity of title is determined by the conditions existing at the time of the taking." *Higginson v. United States,* C. C. A. 6, 384 F. (2d) 504. But here the state and its delegated agency are precluded from any use of this property other than a permanent one by virtue of the contract with HUD and the act enacted pursuant to that contract.

The taking in this instance is therefore a permanent one; even though the Commission will terminate in 1972, the property will remain vested in the state— just as much so as the state highways, the property of state universities or the lands of numerous commissions and agencies created by the General Assembly. The tract in this instance is being condemned by the state itself and will be preserved as a park.

The taking is permanent in nature, and there is no basis for an injunction on the grounds that the taking is for a temporary use.

*3. The Public Use in This Taking.*

The landowner contends that the taking does not involve a public use of the property. Lands cannot be condemned for other than a public use of the same. The meaning of that term as applied in the law of eminent domain must therefore be ascertained.

The term public use is an elastic one and must keep abreast of changing social conditions, and the question is one of fact in each particular case. *Gasque v. Town of Conway,* 194 S. C. 15, 8 S. E. (2d) 871. "From the nature of the case, there can be no precise line. The power requires a degree of elasticity to be capable of meeting new conditions and improvements and the ever-increasing necessities of society. The sole dependence must be on the personal wisdom of the sovereign authority, supervised, and in cases of gross error or extreme wrong controlled by

the dispassionate judgment of the courts." *Olmstead v. Camp,* 33 Conn. 532, 551, 89 Am. Dec. 221.

In *Riley v. Charleston Union Station Co.,* 71 S. C. 457, 461, 51 S. E. 485, our Supreme Court confirmed a circuit court decree which used this language:

"What constitutes a public use? 'The term public use is flexible and cannot be confined to public use known at the time of framing the Constitution. All improvements that may be made, if useful to the public, may be encouraged by the exercise of eminent domain. Any use of anything which will satisfy a reasonable public demand for facilities of travel, for transmission of intelligence or commodities, would be public use." *Trenton, etc. Turnpike Co. v. American, etc., Commercial News Co.,* 43 N. J. L. 381, 384, * * *

In *Edens v. City of Columbia,* 228 S. C. 563, 91 S. E. (2d) 280, 282, our Court said:

"* * * In still other states the power of eminent domain may be exercised for a public purpose, benefit or the public welfare, as contrasted with the requirement of our constitution that it be for a public use. *Redevelopment Agency, etc. v. Hayes,* 1954, 122 Ga. App. (2d) 777; *Schenck v. City of Pittsburgh,* 1950, 364 Pa. 31, 70 A. (2d) 612; *State ex rel. Bruestle v. Rich,* 1953, 159 Ohio St. 13, 110 N. E. (2d) 778; *Nashville Housing Authority v. City of Nashville,* 1951, 192 Tenn. 103, 237 S. W. (2d) 946; *Velishka v. City of Nashua,* 1954, 99 N. H. 161, 106 A. (2d) 571, 44 A. L. R. (2d) 1406; *Gohld Realty Co. v. City of Hartford,* 1954, 141 Conn. 135, 104 A. (2d) 365, 368."

From the last cited we quote:

"In this state [Connecticut] it is settled that public use means public usefulness, utility or advantage, or what is productive of general benefit, so that any appropriating of private property by the state under its right of eminent domain, for purposes of great advantage to the community, is a taking for public use."

A park for the use of the public has long been recognized as a public use. *Wright v. Walcott,* 238 Mass. 432, 131 N. E. 291, 292, 18 A. L. R. 1242; *United States v. Dieckmann,* 7 Cir., 101 F. (2d) 421, 424; *Johnson v. City of Corpus Christi,* Tex. Civ. App., 416 S. W. (2d) 504; *Johnson City v. Cloniger,* 213 Tenn. 71, 372 S. W. (2d) 281. Thus a public use was recognized in a Mississippi case where the land was condemned for pollution control, control of access, public park and picnic areas, and as a wild life sanctuary. *Pearl River Valley Water Supply District v. Brown,* 248 Miss. 4, 156 So. (2d) 572, 576, 158 So. (2d) 694. As long as the use is of benefit, utility or advantage to the public, the use is a public one within the meaning of the law of eminent domain. Public health, recreation and enjoyment are recognized public uses. *Rindge Co. v. Los Angeles County, Cal.,* 262 U. S. 700, 43 S. Ct. 689, 67 L. Ed. 1186.

Even though the lands could not be adapted for use as a park, the taking of a portion of the palisades on the Hudson River adjoining a state park for the purpose of preserving the scenic beauty of the river and of the park was for a "public use". *Bunyan v. Commissioners of Palisades Interstate Park,* 167 App. Div. 457, 153 N. Y. S. 622, 627.

Parking, not a problem in most areas before the advent of the automobile is now a recognized public use for which properties may be condemned. *City of Richmond v. Dervishian,* 190 Va. 398, 57 S. E. (2d) 120, 124. The fact that such a parking area would benefit nearby stores did not prevent the condemnation for a "public use." Even though a public parking area might be of special benefit to private individuals, off-street parking facilities in public ownership constitutes a "public use" in an eminent domain proceeding. *Ermels v. Webster City,* 246 Iowa 1305, 71 N. W. (2d) 911, 912.

The condemnation of a site of historical significance, such as the Star Spangled Banner Flag House has been recog-

nized as a public use. *Flaccomio v. Mayor & City Council of Baltimore,* 194 Md. 275, 71 A. (2d) 12, 14. Preserving and marking the site of the Battle of Gettysburg was held to be a public use of lands and therefore subject to condemnation. *United States v. Gettysburg Electric R. Co.,* 160 U. S. 668, 16 S. Ct. 427, 429, 40 L. Ed. 576. So also the taking of lands for a memorial to the sailors of Salem, Mass., was for a public use in the constitutional sense. *In re* opinion of the Judges, 297 Mass. 567, 8 N. E. (2d) 753.

The landowner contends that there is no public use in this taking and cites the case of *Edens v. City of Columbia,* 228 S. C. 563, 91 S. E. (2d) 280, and *Tuomey Hospital v. City of Sumter,* 243 S. C. 544, 134 S. E. (2d) 744, in support of that position. Both of those cases involved condemnation for private uses; here the use is a public one, for a public purpose and of public benefit.

In *Edens,* the lands were being condemned for clearance of a slum area and resale to private persons or corporations for commercial and industrial development. The Court properly held that this was a condemnation for a private use. No such plan is involved here; in fact, the contract by which the lands are being acquired with HUD funds and the legislative enactment specifically rsetrict the use of the property indefinitely to public park purposes.

In Tuomey Hospital, the establishment which sought the protection of *public use* was an eleemosynary hospital corporation created under a will; the court held that a factual issue as to the public or private nature of the hospital had to be resolved at trial. There is no question about the status of The South Carolina Tricentennial Commission; it is a public body, a part of the State of South Carolina itself.

That the uses for which this property, along with other sites for the Tricentennial exhibits, are being taken are public purposes was recognized in the case involving the bond issue with which these lands in part are being purchased. Historical and recreational purposes are

recognized public uses. See *Mims v. McNair,* S. C., 165 S. E. (2d) 355, 363.

Nothing in this record shows that the property is being taken for any private use; in fact the contract with HUD and the legislative enactment of 1968 preclude anything save a public use of the block, including the lands of this landowner.

In most cases there are no such stringent requirements, but here there can be no use of this property other than a public use.

This lot is being taken for a public use under the specific enactments of the General Assembly; any private use of the property would be in direct contravention of the legislative direction.

The taking of this property is for a public use, and there is no basis for granting an injunction on this ground.

*4. No Denial of Constitutional Protections in this Proceeding.*

The landowner is being afforded the protection and rights guaranteed her by the Constitutions of the United States and South Carolina.

If the taking of property under eminent domain proceedings accords the landowner a reasonable opportunity to be heard on the question of damages, then the essentials of due process are met. The courts, in an eminent domain proceeding, are not concerned with the wisdom of the law granting the power of eminent domain. 26 American Jurisprudence (2d) p. 647, 661 Eminent Domain No. 8 and No. 19.

As far as due process and equal protection of the laws are concerned, no particular procedure is guaranteed. The constitutional requirements are satisfied if the condemnee has:

(1) Reasonable notice,

(2) Reasonable opportunity to be heard and present the claim or defense, and

(3) Reasonable compensation for the property taken. *27 American Jurisprudence (2d)* p. 242 Eminent Domain No. 376.

Whether there is a necessity, a permanent taking or a public use are primarily legislative questions, and there is a presumption that the use contemplated is a necessary, permanent and public one. The burden would be upon the landowner to show that the public use is a sham and a fraud. *27 American Jurisprudence (2d)* p. 283, Eminent Domain No. 403.

If there is no necessity for the use or the condemnation proceeding's purpose is to cloak some sinister scheme, then the courts may interfere with the taking, but there is no showing of that kind here. There has been no abuse of the legislative power in this case on the matter of the necessity, permanent taking or public use of the property.

If the trial accords the landowner the guarantee of adequate compensation under equitable rules, then the requirements of due process are met. That will be done by the procedure prescribed for this taking.

I have already ruled on the matters which might deny the landowner due process and the equal protection of the laws; there is no basis for an injunction on these grounds.

5. *The Legislative Enactment Giving the Power of Eminent Domain to The Tricentennial Commission as General Legislation.*

Landowner attacks that the legislation as special legislation prohibited by the South Carolina Constitution on two grounds:

(1) The Public Works Eminent Domain Law, which excludes several counties from its effect, is unconstitutional.

(2) The legislative enactment granting the power of eminent domain is special legislation since in practice it applies only to this landowner.

As far as the issue of special legislation in regard to the Public Works Eminent Domain Laws is concerned, the case of *University of South Carolina v. Mehlman,* 245 S. C. 180, 139 S. E. (2d) 771, disposes of this issue. Mehlman contended that the Public Works Eminent Domain Laws was special legislation because it excluded seven counties from its provisions. In that case, I held that this law was void and unconstitutional, but the Supreme Court refused to pass on that issue. Instead the court held that the General Assembly merely prescribed the manner in which the University was to exercise the power of eminent domain.

The statute, according to the Court's decision, incorporated by reference those parts of the Public Works Eminent Domain Laws which are general in nature. Since this did not include those special provisions excluding certain counties the general provisions only applied and the University's power of eminent domain was upheld.

The same reasoning applies to the enactments which gave The Tricentennial Commission the power to condemn. The Joint Resolution merely prescribed the manner in which the power is to be exercised—that is, in accord with the general statutory procedure set out in Chapter 3, Title 25 of the Code. The language used is "in the manner prescribed * * *"

The *Mehlman* case is directly in point and is the basis for holding that the enactment is not special legislation. There is no basis for a holding that the provision excluding certain counties in the Public Works Eminent Domain Act constitute special legislation, for this provision is not a part of the procedure prescribed in granting the exercise of the power of eminent domain to this Commission.

(2) The legislation is general in its terms and application and the fact that it may only be invoked on account of one landowner would not make this special legislation.

On the question of special legislation, the Supreme Court said in *Elliott et al. v. Sligh,* 233 S. C. 161, 103 S. E. (2d) 923:

"* * * The fact that legislation is expressed in general terms is not controlling. A law general in form, but special in its operation, violates a constitutional inhibition of special legislation as much as one special in form. The question must be decided not by the letter, but by the spirit and practical operation of the act. *Town of Forest Acres v. Town of Forest Lake*, 226 S. C. 349, 85 S. E. (2d) 192."

The legislation in *Elliott* prohibited the sale of fireworks "in a county containing a municipality having a population of over sixty five thousand inhabitants according to the last official United States census." Only Richland and Charleston counties were affected. The law was attacked as special legislation prohibited by Article III, Section 34, Subdivision 9 of the South Carolina Constitution. The Court said in *Elliott* (233 S. C. p. 165, 103 S. E. (2d) p. 925):

"All considerations involving the wisdom, policy or expediency of an act are addressed exclusively to the General Assembly. We are only concerned with the power of that body to enact a law. Every presumption will be made in favor of the constitutionality of a legislative enactment. But when the unconstitutionality of an act is clear to this court, beyond a reasonable doubt, then it is its plain duty to say so, *Thomas v. Macklen,* 186 S. C. 290, 195 S. E. 539."

Holding that a population classification has "no natural or logical relation" to the purpose of the fireworks statute, the Supreme Court in *Elliott* held that a general law applicable to the whole state was proper and that the special act was therefore unconstitutional.

In the Forest Acres case, the same rule applied as in the *Elliott* case: although general in terms, the legislative enactment applied only to counties containing a city of over 85,000 in the 1950 census. Only Richland County fitted into this category. The Court held that the classification was arbitrary and that this fact made this special legislation since by its express terms it applied to only one county and four small municipalities in that county which could have been annexed.

There are no limitations in the legislation which granted this power to The Tricentennial Commission.

The fact the funds have been appropriated for acquisition of lands only in Charleston, Richland and Greenville counties is not determinative of the issue. The General Assembly could have appropriated funds for projects in all 46 counties. The grant of power is in no way restricted. There are therefore none of the evils of special legislation.

The power being general in its terms and general in its application, this is not special legislation and does not smack of the evil at which the constitutional prohibition was aimed. As *Elliott* shows, the purpose of the provision is to prevent the legislature "in its wisdom" from creating 46 different county governments or penalizing some particular counties.

The evil at which the constitutional provision against special legislation was aimed resulted from "legislation by delegation." As the Court said in *Tisdale v. Scarborough,* 99 S. C. 377, 83 S. E. 594:

"* * * That kind of legislation [*i. e.,* special legislation] was deemed pernicious; it lacked the settled consideration and consent of the lawmaking body; it evaded state-wide responsibility; it encouraged local activity; it discouraged the attrition of minds and the consideration of those problems which make for a wise public policy * * *."

The fact that the enactment only affects one person or one locale does not make the act special legislation. *Spitcaufsky v. Hatten,* 353 Mo. 94, 182 S. W. (2d) 86, 160 A. L. R. 990, 1021.

In *Eyers Woolen Co. v. Town of Gilsum,* 84 N. H. 1, 146 A. 511, 64 A. L. R. 1196, the New Hampshire court held that a statute exempting a particular private corporation from taxes was improper, where a general law would have been appropriate. As long as a law operates uniformly, it is not obnoxious to a constitutional provision against special legislation. *People ex rel. Curren v. Wood,* 391 Ill. 237, 62 N. E. (2d) 809, 161 A. L. R. 718. The

fact that a particular law would apply to only one city where a population basis was provided would not make that law special legislation. *State of Iowa ex rel. Welsh v. Darling,* 216 Iowa 553, 246 N. W. 390, 88 A. L. R. 218.

The designation of the highways to be paved in a particular county contravenes the prohibition against special legislation. *Knight v. Hollings,* 242 S. C. 1, 129 S. E. (2d) 746. A bill to provide for appointment of members of forestry board of a particular county was unconstitutional where there was a general statute providing for such appointments. *McElveen v. Stokes,* 240 S. C. 1, 124 S. E. (2d) 592.

The case of *Ellison v. Cass,* 241 S. C. 96, 127 S. E. (2d) 206, involved an attempt by the City of Greenville to allow the construction by private individuals of a motor vehicle parking building over a public street. The city issued a permit for that purpose, and in 1959 that action was enjoined. An act limiting the population bracket to Greenville was vetoed by the Governor in 1960 as special legislation, and an act general in form was held unconstitutional where the act allowed the private owners "to encroach over a State Highway in the construction of a private business building and that this privilege is denied to any and all other persons." [*Ellison v. Cass, supra,* 241 S. C. at page 101, 127 S. E. (2d) at page 208.]

The case of *Thomas v. Macklen,* 186 S. C. 290, 195 S. E. 539, cited in the *Cass* case, involved a statute prescribing incorporation of "resort communities". The Supreme Court held that act invalid because there was no reasonable basis for the special legislation enacted which was passed to apply to Myrtle Beach.

After the hearing and testimony were completed, the landowner's attorneys in connection with the submission of their reply brief asked the Court to consider certain additional evidence which was "discovered" after the hearing on the merits. That testimony consists of statements made before the Judiciary Committee of the House of Representatives

of the General Assembly during a hearing on the proposed legislation granting the power of eminent domain to the South Carolina Tricentennial Commission.

The members of that committee, according to this offer of testimony, would have testified that the executive director of the Commission advised the committee "that the power requested by the Tricentennial Commission of eminent domain was only to be used in Columbia, South Carolina * * *" and that "its use was not anticipated elsewhere."

These witnesses, according to the landowner's attorneys, would also testify that this assurance "expressed the intended purpose of the legislation and was necessary for its approval by the committee."

Counsel for the Commission has objected to the offer of all such testimony on the grounds that testimony at the hearing is irrelevant in the absence of an ambiguity in the enactment and additionally that the testimony as to the purpose and circumstances of the approval of the enactment consists of conclusions on the part of the witnesses.

While this testimony is not properly before the Court and a complete legislative history might reveal other testimony as to the purposes and course of this legislation's passage, I am considering the same in order to prevent any further delays in the consideration of the issues before the Court on the validity of this statute.

If a statute is clear and explicit in its language, then there is no need to resort to statutory interpretation or legislative intent to determine its meaning. The enactment here is clear, precise and explicit; it grants to this Commission the power of eminent domain to be exercised in the manner prescribed in the Public Works Eminent Domain Statute.

The fact that this enactment is going to be used in only one locale or that it may be used against this landowner only is not determinative of the issue: the statute is general in its application, and it is not directed at any particular person.

The fact that the enactment operates as to only one person is not the test. Had one person or area been excluded from the operation of the statute, that might be fatal, but here the statute has no such exclusions.

Where the language of a statute is doubtful or uncertain in meaning, then the Court can look to the circumstances and conditions existing at the time of its enactment. *Abell v. Bell,* 229 S. C. 1, 91 S. E. (2d) 548. But where the language is clear and explicit, the courts cannot rewrite the statute and inject matters into the statute which are not in the legislature's language. *United States v. Shirah,* C. C. A. 4, 253 F. (2d) 798, 800.

Legislative enactments are to be construed as they are written, and, unless there is an ambiguity in the legislation, resort to statements by members of a committee will not be considered in construing a particular piece of legislation. 50 American Jurisprudence pps. 326-328, Statutes Nos. 335-337.

As our Court said in *Abell v. Bell,* 229 S. C. 1, 4, 91 S. E. (2d) 548:

"If the intent of the legislature be clearly apparent from its language, the court may not embark upon a search for it dehors the statute. * * *

"But where the language of the statute gives rise to doubt or uncertainty as to the legislative intent, the search for that intent may range; for it must be gathered from a reading of the statute as a whole in the light of the circumstances and conditions existing at the time of its enactment. * * *"

Nothing is required to interpret or construe the legislative enactment which gave this Commission the power of eminent domain. The grant of power is complete, plain and unambiguous. Legislative intent in such a case is to be determined from the language employed; legislative history only can be resorted to for the purpose of solving doubt, not for the purpose of creating it.

This being the case, I hold that this is not special legislation and that the act is constitutional.

*6. The Enactment Granting the Power of Eminent Domain Not Defective.*

The enactment granting the power is specific and clear; that the legislature can delegate the power of eminent domain to subsidiary agencies is settled.

The landowner complains because the joint resolution ■ granting the power of *eminent domain* only referred to the resolutions of 1956 and 1966 in its title and referred to the 1956 act "as amended". Even if this title reference alone is considered, that would not destroy the validity of the statute because it is the section adopted in 1966 which is being amended.

The body of the resolution uses the simple language "as amended" in referring to the original (1956) resolution, and this would certainly include all subsequent enactments.

The landowner contends that because the express statute was not referred to in the enacting phrase (Act No. 1141, 1966), the enactment is defective. The answer is:

(1) The particular enactment being amended (No. 1141, 1966) was referred to specifically in the title,

(2) The express section being amended was specifically quoted, and

(3) There is no difficulty in determining the amendments to the original (1956) act.

The express wording of the statute shows that the General Assembly in explicit and clear language gave to The South Carolina Tricentennial Commission the power of *eminent domain.*

The legislative enactments (other than appropriations bills and bond enactments) show the present status of the 1956 act, as amended in 1966, 1968, and 1969. Wherein there is a defect is not apparent to the Court.

The act as enacted is clear and specific, and the legislative authortiy for the proceedings in *eminent domain* has been specifically granted by the General Assembly.

Accordingly there is no basis for holding the act defective.

It is therefore ordered:

1. That the temporary injunction enjoining condemnation proceedings against Annie Mary Timmons is hereby dissolved;

2. That the prayer for a permanent injunction is denied;

3. That the Complaint of the Landowner in Docket No. 3650 is dismissed.

We now consider,

## THE CONDEMNATION PROCEEDING

The landowner filed ten exceptions alleging error on the part of the lower court and asked that a new trial be granted. Such exceptions are reduced to four questions as set forth in appellant's brief as follows:

## QUESTION I

"Did the trial judge err in abusing his discretion by refusing appellants motions for a continuance and should he have granted appellant a new trial by reason thereof?"

The condemnation proceeding was commenced June 6, 1969. The injunction proceeding was commenced four days later. Service in the condemnation proceeding was effected after the process server made 42 trips to the apartment of Miss Timmons. She denied that she was ever served, but the trial judge found as a fact that service had been brought about. After an order had been filed denying an injunction in the injunction proceeding, the landowner, about October 1, employed Owen T. Cobb, Jr. of the Columbia Bar, to represent her in the condemnation case. He appeared for her at a deposition hearing October 24, 1969, and on November 12, 1969 appeared in this court asking a stay of proceedings, which was denied. Mr. Cobb and Miss Timmons could not

agree upon a contract for legal services and the trial court relieved him as counsel on November 20, 1969. Simultaneously, the court set a pretrial conference for November 25, 1969, and set the trial for December 1, 1969. On November 19, 1969 she employed Mr. Cole, who is now her counsel, and he appeared in the case for the first time at the pretrial hearing November 25.

On December 1 Mr. Cole moved for a continuance based on a certificate of an intern of the Aiken County Hospital emergency room dated November 29, 1969, and a certificate of a medical doctor in Columbia at the emergency room on the morning of December 1. Each certificate indicated that Mr. Cole had an upper respiratory infection. The motion was overruled and the case proceeded to trial, consuming a total of five days. Mr. Cole participated in the case, and on December 8 appeared to move for a new trial.

The matter of a continuance is addressed to the discretion of the trial court; such a ruling will not be disturbed unless manifestly erroneous. *Poston v. Home Insurance Company of New York,* 191 S. C. 314, 4 S. E. (2d) 261. Neither of the statements indicated that Mr. Cole's health would be impaired by a courtroom appearance. No further showing of inability to try the case was made during the five day proceeding. We find no abuse of discretion.

## QUESTION II

"Did the trial judge err by admitting evidence over objections and/or motions to strike of appellant's counsel and should he have granted appellant a new trial by reason thereof?"

The admission of evidence is largely a matter of discretion of the trial judge. In order for this court to reverse a case based on the erroneous admission or erroneous exclusion of evidence the plaintiff must show error and prejudice. The testimony is not printed as a part of the transcript of record; we cannot find in the record before us

basis for holding that there was such an abuse of discretion as to warrant a new trial.

## QUESTION III

"Did the trial judge err by excluding evidence proffered by appellant with respect to pending injunction suit in Richland County Court by appellant against City of Columbia?"

The record shows that the appellant on October 24, 1968, through counsel not heretofore mentioned in this proceeding, commenced an action against the City of Columbia in the Richland County Court asking that the City of Columbia be enjoined from using its powers of *eminent domain* to condemn the property here involved for the benefit of the South Carolina Tricentennial Commission. The issue involved in a condemnation proceeding is value of property. Apparently counsel contends that evidence relative to this county court action should have been admitted in evidence to show prejudice of witnesses for the respondent and as it might affect their credibility. Although evidence attacking the credibility of an adverse witness is normally admissible, we cannot say that there has been reversible error since the testimony of the witnesses is not before us.

## QUESTION IV

"Did the errors and/or abuses of discretion on the part of the trial judge, taken together as a whole, constitute a denial of due process of law guaranteed to this appellant by the State and Federal Constitutions?"

The effect of appellant's contention in this question is to generally attack the entire procedure. Counsel argues that four days' notice of the hearing resulting in Judge Timmerman's order of November 20, 1969, was not given as required by the Code. This order, among other things setting the trial for December 1, is not the type of order contemplated by the Code. The trial judge may set a case for trial without a four day notice, or for that matter, may call a case to trial without any order having previously

been issued. The fact that the appellant was advised that the case would be tried on a certain day should have been helpful in preparation of the case. If it was difficult for counsel to prepare for trial after he was belatedly employed, such is largely attributable to his client's failure to arrange for her own representation. It is not an error attributable to the court.

In a condemnation proceeding the issues are simple. The court is in quest of the reasonable fair market value of the property taken. There is nothing in the transcript before us to convince us that ample opportunity to explore that issue was not afforded the landowner.

The appeal in the condemnation case is accordingly found to be without merit, and the judgment of the lower court in both the injunction proceeding and the condemnation proceeding is,

Affirmed.

Moss, C. J., and LEWIS, BUSSEY and BRAILSFORD, JJ., concur.