TAYLOR, J.
The City of Hollywood Community Redevelopment Agency (CRA) appeals an order denying its request for an order of taking and dismissing its petition in eminent domain. The CRA sought to take the subject property, a lot with a one-story commercial building owned by the Mach family, as part of its community redevelopment plan. The trial court found that there was no necessity for the taking. Because the CRA presented some evidence of the reasonable necessity for the taking, the trial court was required to defer to the CRA’s determination that the property was necessary for the redevelopment and uphold that decision. We thus reverse the trial court’s order.
A Broward County resolution allowing the City of Hollywood to create a community redevelopment agency (CRA) was passed on April 3, 1979. In 1979, the City established the CRA by resolution. As part of the resolution, certain statutory blight factors were identified, such as inefficient traffic flow, inappropriate platting patterns, diversity of ownership, and inappropriately-mixed land uses.
In 1981, the City adopted a community redevelopment plan for the Central City Area to restore and redevelop the City’s downtown commercial district. The plan identified its priority as redeveloping the center or core of the area and then working towards the perimeter. The subject parcel is located within the core or central area of the redevelopment area.
The plat which includes the subject property was recorded in 1921. The plat contains a series of extremely small lots that do not provide for any type of internal circulation, parking, or landscape buffers. The lots are only twenty-five feet wide. Block 40 contains Young Circle, which City of Hollywood Mayor Mara Giulianti describes as arguably the most important feature of their downtown. In Block 40, the majority of the buildings face the historic, three-story Great Southern Hotel. The parcel at issue in this case, the Mach parcel, is Lot 1 in Block 40. Located on this parcel is a single narrow building, which houses four small businesses. The northern edge of the Mach parcel is separated from the southern edge of the Great Southern Hotel by a public alley thirteen feet wide.
*1140 In 1985, the community redevelopment plan was amended by ordinance and made more specific. It identifies six redevelopment sites surrounding Young Circle in the central business district. Those are priority areas where redevelopment efforts were to be targeted to generate the best impact. Block 40 was identified as a target area. The redevelopment plan called for the restoration of the Great Southern Hotel, if “structurally and economically feasible.”
The final amendment to the redevelopment plan was made by a 1995 ordinance, which added more detail regarding the Harrison Street streetscape and sought to accommodate sidewalk cafes and pedestrian access points. It identified the entire Block 40 as a redevelopment site, which would include the subject property.
Developer Chip Abele has been able to assemble 13 of the 14 lots in Block 40. He proposes to build on that property the “Young Circle Commons” project. The bottom floor will be retail, with six floors of parking above that. Above the parking area is a common amenity floor with a recreation room, swimming pool, and social room. Above that are more than a dozen floors of residential condominiums.
John Fullerton and his firm are the architects for the project. Very early on, they considered demolishing 15 or 16 feet of the Great Southern facade adjacent to the alley for the residents’ entry. However, they never presented this as an option to the CRA. Instead, they first publicly presented the “Harrison Street option.” This design was to have an entrance/exit area for the parking garage off Harrison Street. This option would not have impacted the fagade of the Great Southern Hotel and would not have required acquisition of the Mach parcel. The developer submitted the original plan sometime in November 2002.
This development will generate 4,000 trips per day, several hundred in the peak hour. Miguel Santibanez is a traffic engineer for the City. He reviewed the plan for compliance with the technical requirements within the Code of the City. Santi-banez found that the Harrison Street garage entrance was too close to the 19th Avenue intersection. There were significant problems for ingress and egress. The exit lane from the garage would have been very close to the crosswalk and there would have been several safety impacts on pedestrian and vehicular traffic based on the location of the driveway. According to Robert Rawls, the head of the City’s building and engineering services department, the plan would have ended up with gridlock, with cars trying to make left turns into the garage through stopped traffic at the light. The planners looked at other access points more mid-block on Harrison, but it was still a major pedestrian corridor as contrasted with 19th Avenue. There was still the gridlock scenario. None of the options worked well on Harrison. All of the traffic considerations brought them back to 19th Avenue. They explored ingress and egress on Hollywood Boulevard and Young Circle also, but did not find that they were viable options.
The plan was then changed, moving the entrance to the parking garage over to 19th Avenue. The entrance/exit of the garage is now approximately mid-block, which offers cars a better chance of finding a gap to be able to get out of the garage. 19th Avenue is wider and much more conducive for access and egress as opposed to Harrison Street. It was undisputed that this plan is the safest design for access to the site. It had the least impact on pedestrian movements and the least impact on vehicular movements. The garage entrance needed to be mid-block on 19th Avenue. Architect Fullerton, who de *1141 signed the original Harrison entrance, testified that the new design “very definitely ... is a better solution than what we had originally.”
With this design the planners were also able to preserve the entire western fagade of the Great Southern Hotel. However, this design required the taking of the Mach property, because seventeen feet of the thirty foot garage entrance is now to be situated on the Mach property. Land Planner Keller testified that there would be a detrimental planning impact if the project is designed around the Mach parcel, stating, “Unfortunately, if you do that, you are left with a narrow 25-foot parcel that is right there on the corner of one of your key commercial blocks in the downtown that’s going to be surrounded on all sides by a high-rise structure with far more intense use; and for it to remain in its current condition, it is not going to be consistent with that; and if it’s ever removed then you are going to have a remnant parcel that will have virtually no functional utility to it.”
Architect Tamara Peacock is a member of the Broward Trust for Historic Preservation and the chair of the Hollywood Preservation Board. She testified that the original plan was to restore the Great Southern Hotel, which had been shut down by fire officials in 1991. However, it became apparent that the whole building could not be saved. Both the state and federal governments have expressed concern about even the partial demolition of the Great Southern. Under the current proposal, the developer will do a fagade restoration. The proposal is to completely preserve the north fagade, the west fagade, and a portion of the east. Those facades have the significant fenestration and architectural detail. The primary windows with the large arches and striped awnings will be restored along that fagade to create the original streetscape. They will bring it back to the original fagade of the 1920’s. It is necessary to acquire the Mach property in order to save a portion of the west fagade. Without the Mach property, from 16 to 25 feet of the west fagade would be lost. The west fagade will be completely restored if the Mach property is acquired.
In June 2005, the City Commission voted to condemn the Mach parcel. On August 5, 2005, the CRA brought its petition in eminent domain, seeking to take the subject property.
The trial court denied the requested order of taking and dismissed the petition in eminent domain. The court found that the CRA had “demonstrated a valid public purpose, i.e., the redevelopment of a blighted area.” However, it went on to find, “[b]ased upon the totality of the testimony and evidence presented, as weighed and considered by the Court, the Petitioner did not prove by competent, substantial evidence that the condemnation of Respondent-Owner’s property is reasonably necessary for the public purpose alleged in this case.”
The term “blight” is borrowed from science and connotes an organism that promotes disease. City of Norwood v. Horney, 110 Ohio St.3d 353, 853 N.E.2d 1115, 1134-35 (2006). It has become synonymous with urban decay. Id. “Urban renewal, through the force of eminent domain, became the treatment for saving the body politic from the spread of blight....” Id. at 1135. Florida’s Community Redevelopment Act of 1969 provided for the creation of community redevelopment agencies and vested in them the power of eminent domain. See § 163.330-375, Fla. Stat. (1979).
A “two-tiered” model is applied in determining whether a condemning authority has met its burden of proving rea *1142 sonable necessity for a taking. City of Jacksonville v. Chiffin, 346 So.2d 988, 990 (Fla.1977). First, the condemning authority must show a reasonable necessity for the condemnation. Id. If such proof is presented, the exercise of the condemning authority’s discretion should not be disturbed in the absence of illegality, bad faith or gross abuse of discretion. Id.
In order to meet its initial burden, the condemning authority need present only “some evidence” of reasonable necessity. Id.; Broward County v. Ellington, 622 So.2d 1029, 1031 (Fla. 4th DCA 1993). Thus, the critical question posed by this appeal is whether the CRA presented “some evidence” of reasonable necessity. This “some evidence” inquiry is similar to questions appellate courts face in reviewing summary judgments and motions for directed verdict. Like those, the question here concerns a matter of law subject to de novo review.
The condemning authority is required to show only some evidence of a reasonable necessity for the taking, not an absolute necessity. See Canal Auth. v. Litzel, 243 So.2d 135, 137-38 (Fla.1970); Canal Auth. v. Miller, 243 So.2d 131, 134 (Fla.1970); Ellington, 622 So.2d at 1031. In this case, the CRA showed that it considered alternative plans, but that they were unsuitable. The CRA also pointed out that, as a matter of long-range planning, it made no sense to have the tiny Mach parcel remain, surrounded by a high-rise complex, with the likelihood of it becoming an unusable remnant parcel when the current building outlived its usefulness.
The condemning authority need not present evidence pinpointing the need for the particular property sought to be condemned. Griffin, 346 So.2d at 991. Broad discretion is vested in the condemning authority to determine what property and how much is necessary to condemn for public purposes, and the trial court may not refuse the application on such concerns absent a clear abuse of discretion. Id.; Cordones v. Brevard County, 781 So.2d 519, 522 (Fla. 5th DCA 2001). A landowner cannot complain simply because some other location might have been made or some other property obtained which would have been suitable for the purpose. Pasco County v. Franzel, 569 So.2d 877, 879 (Fla. 2d DCA 1990) (quoting Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527, 535 (1929)).
There were only three options presented for the entrance site to the parking garage: 1) the Harrison Street option, which was unsafe; 2) the Great Southern option, which destroyed a significant portion of the western fagade of the historic hotel; and 3) the Mach option, which required the taking of the subject parcel. Historic preservation is a legitimate basis upon which to disqualify an .alternative site plan. The Community Redevelopment Act of 1969 recognizes that community redevelopment projects may include “rehabilitation and conservation in a community redevelopment area.” See § 163.340(9), Fla. Stat. (1979). The CRA argues that this language encompasses the concept of historic preservation. We agree.
The Florida Legislature has since adopted the Local Government Comprehensive Planning and Land Development Regulation Act. § 163.3161(1), Fla. Stat. (1987). Under that act, each comprehensive plan must include a conservation plan which designates “historically significant properties meriting protection.” § 163.3177(6)(a). The legislature presumably did not intend to so narrowly apply the concept of rehabilitation and conservation in section 163.340(9) as to put community redevelopment projects at odds with *1143 its clear goal of preserving historic properties as expressed in its requirements for local comprehensive plans.
The power of eminent domain has been granted to government to preserve areas of historic interest. Devon-Aire Villas Homeowners Ass’n. v. Americable Assocs., Ltd., 490 So.2d 60, 62 n. 6 (Fla. 3d DCA 1985); see also Lubelle v. City of Rochester, 145 A.D.2d 954, 536 N.Y.S.2d 325 (N.Y.App.Div.1988) (“there is no dispute that historic preservation serves a public purpose”). As the South Carolina Supreme Court recognized in Timmons v. South Carolina Tricentennial Commission, 254 S.C. 378, 175 S.E.2d 805, 813 (1970):
The condemnation of a site of historical significance, such as the Star Spangled Banner Flag House has been recognized as a public use. Flaccomio v. Mayor & City Council of Baltimore, 194 Md. 275, 71 A.2d 12,14 [1950], Preserving and marking the site of the Battle of Gettysburg was held to be a public use of lands and therefore subject to condemnation. United States v. Gettysburg Electric R. Co., 160 U.S. 668, 16 S.Ct. 427, 429, 40 L.Ed. 576 [1896]. So also the taking of lands for a memorial to the sailors of Salem, Mass., was for a public use in the constitutional sense. In re Opinion of the Judges [Justices], 297 Mass. 567, 8 N.E.2d 753 [1937].
If a government can take property solely for historical purposes, it follows that it can refuse to consider development alternatives which would destroy historic property, even in part.
Although we agree with the position espoused in the dissent that “a condemning authority is not permitted to acquire through eminent domain a greater quantity of property than is necessary to serve the particular public use for which the property is sought,” here the property owner did not argue its right to retain just a portion of the parcel. The expert testimony at trial suggested that the property, even in its present condition, is too small to remain viable once the high-rise is built nearly on top of it. Thus, from the parties’ practical point of view, the taking of this parcel appears to be an “all or nothing” proposition.
The trial court never reached the second-tier question as to whether the CRA’s condemnation of the subject property was the product of fraud, bad faith, or an abuse of discretion. Although in some instances we might direct the trial court to consider this question on remand, having reviewed the complete record in this case, we can safely conclude that there is no competent, substantial evidence in the record to support a finding of fraud, bad faith or abuse of discretion. We therefore reverse and remand for entry of an order of taking and such further proceedings as are necessary upon entry of the order. We have considered the cross-appeal and find it to be without merit.

Reversed and Remanded

FARMER, J., concurs.
DAVIDSON, LISA, Associate Judge, concurs in part and dissents in part with opinion.